UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OXBO FRUIT US INC., <br><br> Plaintiff, <br><br> v. <br><br> TRIDENT AG SERVICES, LLC, et al., <br><br> Defendants. | 1:25-cv-00369-EPG (PC) <br><br> ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION, IN PART <br><br> (ECF No. 45) |

**I.     INTRODUCTION**

Plaintiff Oxbo Fruit US Inc. (Oxbo) initiated this case on March 27, 2025, by filing a complaint, generally alleging that, after it acquired their shares of a business through a detailed stock purchase contract, Defendants Nick Hansen, Estevan Tamez, and Kristopher Rodrick took confidential information from Oxbo and used that information in their own company (Defendant Trident Ag Services, LLC) to compete against Oxbo. (ECF No. 1).

Now before the Court is Oxbo's motion for a preliminary injunction against Defendants Trident Ag Services, LLC, Nick Hansen, Kristopher Rodrick, and Estevan Tamez (collectively Defendants). (ECF No. 45).

As explained below, the Court will grant Oxbo's motion, in part.[1]

\\\

---

[1] The parties have consented to Magistrate Judge jurisdiction for all proceedings, and on July 14, 2025, the formerly presiding District Judge reassigned the case to the undersigned. (ECF No. 40).

1

## II. BACKGROUND

### A. Oxbo's Complaint

Oxbo's complaint alleges that, on December 20, 2023, Oxbo acquired a company called Westside Equipment Co., (Westside), which designs, manufactures, and distributes specialized agricultural machinery. (*Id.* at 4). In exchange for agreeing to the purchase contract, each Defendant received hundreds of thousands of dollars. (*Id.* at 5).

After execution of the purchase agreement, Oxbo employed Defendants "in the same managerial and senior positions they had prior to the sale and enjoying the same level of access to . . . Oxbo's confidential and proprietary business information once belonging to Westside." (*Id.*). However, Defendants allegedly used their positions to access trade secret information and then used that information in their newly formed companies (including Defendant Trident Ag Services, LLC) to compete against Oxbo and to solicit its customers. (*Id.* at 6).

The complaint alleges multiple causes of action, including trade secret misappropriation in violation of California Civil Code § 3426.1. (*Id.* at 10).

### B. Oxbo's Motion for a Preliminary Injunction

Oxbo filed a motion for a preliminary injunction on September 23, 2025. (ECF No. 45). While the scope of relief has narrowed (as explained further below), Oxbo initially sought an injunction generally (1) preventing Defendants from soliciting its customers and (2) requiring Defendants to refrain from misappropriating its trade secrets and to return such information. (ECF No. 45, p. 3).

In support of its motion, Oxbo provides the following:

1. The declaration of David Park, a senior forensic associate at Lighthouse Digital Forensic Services, who provided information relevant to Defendant Rodrick's alleged misappropriation of confidential information.

2. The declaration of Robert Huckaby, the president of Oxbo and previous CEO of Westside, who provided information relevant to Defendants' allegedly solicitation of Oxbo's customers based on the use of confidential information; and

3. The declaration of Bart Kuijpers, the group IT director of Oxbo, who provided information regarding Defendants' alleged misappropriation of

confidential information.

(ECF Nos. 45-2; 45-3; 45-4).[2]

Defendants filed their opposition on October 17, 2025. (ECF No. 48). Mainly, they argue that the stock purchase agreement is not enforceable because Defendants only received the signature pages of the agreement and believed the agreement only concerned Defendants' shares of their stock in Westside. (*See id.* at 3-4). As to the misappropriation claim, Defendants argue that Oxbo has failed to sufficiently describe any trade secret or demonstrate that it owns trade secrets. (*Id.* at 9-10). Further, they argue that the motion should be denied because Oxbo waited too long to seek relief, and if the motion is ultimately granted, the Court should require a $1 million bond. (*Id.* at 14-16).

In support of their opposition, Defendants provide only the declaration of Defendant Hansen. (ECF No. 48-1). In his declaration, Defendant Hansen represents that he signed the signature pages of the Stock Purchase Agreement without reviewing any of the terms of the contract, and he believed that the contract merely released his shares in Westside without any further terms.  Defendants did not submit any other evidence in opposition to Plaintiff's motion.

Oxbo filed its reply on October 28, 2025. (ECF No. 52). Oxbo argues that it did not delay seeking relief because it did not discover Defendants' alleged misconduct until earlier this year, and that Oxbo swiftly investigated the matter and tried to negotiate a resolution with Defendants before filing the instant motion. (*Id.* at 8-9). Further, Oxbo argues that no bond should be required. (*Id.* at 9).

The Court held a hearing on the motion on October 31, 2025, with counsel for Oxbo and the Defendants appearing telephonically. (ECF No. 54). After substantial discussion during the hearing, Oxbo limited its requested relief for a preliminary injunction to only its misappropriation claim.

Accordingly, and for the reasons set forth on the record, the Court will limit its analysis

---

[2] Oxbo also attached documents to the declarations it provided, *e.g.*, Westside's employee handbook. (*See* ECF No. 45-3, p. 6).

3

in this order to Oxbo's misappropriation claim and request for preliminary injunction related to that claim.

### III.     LEGAL STANDARDS

Federal Rule of Civil Procedure 65(a) permits a court to issue a preliminary injunction. Under Rule 65(d)(2), an injunction may bind only "the parties," their "officers, agents, servants, employees, and attorneys," and "other persons who are in active concert or participation" with the parties. Fed. R. Civ. P. 65(d)(2)(A)-(C). "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." *Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). "When a plaintiff seeks injunctive relief based on claims not pled in the complaint, the court does not have the authority to issue an injunction." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 633 (9th Cir. 2015).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). However, the Court notes that it may weigh a request for a preliminary injunction with a sliding-scale approach. *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (noting that sliding-scale approach remains viable after *Winter*). The Ninth Circuit has described this approach as follows:

> Under the *Winter* test, a party is entitled to a preliminary injunction if it demonstrates (1) "that [it] is likely to succeed on the merits," (2) "that [it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *Cottrell*, 632 F.3d at 1131 (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365). But our court has adopted the "serious questions" test—a "sliding scale" variant of the *Winter* test—under which a party is entitled to a preliminary injunction if it demonstrates (1) "serious questions going to the merits," (2) "a likelihood of irreparable injury," (3) "a balance of hardships that tips sharply towards the plaintiff," and (4) "the injunction is in the public interest." *Id.* at 1135. As to the first factor, the serious questions standard is "a

4

lesser showing than likelihood of success on the merits." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1190 (9th Cir. 2024). Further, under the serious-questions standard, "[s]erious questions need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) (citation and internal quotation marks omitted).

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held[] and to balance the equities as the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. 192, 200 (2025) (internal citation and quotation marks omitted).

## IV. ANALYSIS

### A. Merits of Oxbo's Misappropriation Claim

The Court begins with the merits of Oxbo's misappropriation claim. Oxbo's complaint alleges trade secret misappropriation under California's Uniform Trade Secrets Act (UTSA). (ECF No. 1, p. 10). The UTSA defines misappropriation as follows:

(b) "Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know

1    that it was a trade secret and that knowledge of it had been acquired by accident
     or mistake.

Cal. Civ. Code § 3426.1(b).

"To state a prima facie claim for trade secret misappropriation, a plaintiff must demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1015 (E.D. Cal. 2011) (citation and quotation marks omitted).

Oxbo generally argues that Defendants improperly used Oxbo's confidential trade secrets to compete against Oxbo. (*See* ECF No. 45-1, pp. 20-21). In support, Oxbo has submitted the declaration of Robert Huckaby, Oxbo's President and the former CEO of Westside, which declaration states as follows:

> Over time, Westside developed series of specialized designs to meet individual farmer's needs with regards to harvesting manufacturing. In addition to these designs, Westside developed customer lists, vendor relations, marketing, operations, and business strategies. . . .
>
> In the agricultural harvesting machinery industry, the identity of potential customers is not information which is readily available to the public.
>
> There is no known single source from which one can ascertain the identity of persons who utilize specific machinery for their harvesting needs or who may be interested in purchasing specialized equipment. Instead, the most common and useful way for new agricultural machinery developers and distributors to acquire customers would be through "cold-calling," an often lengthy and costly process.
>
> Oxbo (and previously Westside) compiled its lists of customers over the decades of its business from advertising, contacts, publicity, customer referrals, and other sources of leads that company executives have gathered and learned for the benefits of Oxbo's sales.
>
> In 2023, prior [sic] Oxbo's complete acquisition of Westside, Defendants: Nicolas Hansen, Kristopher Rodrick, and Estevan Tamez signed an acknowledgement and agreement of Westside's Employee Handbook in consideration of further employment. Attached as Exhibit A are a true and correct copies of the Westside Employee Handbook as well as Nicolas Hansen, Kristopher Rodrick, and Estevan Tamez's signatures of acknowledgement.

(*Id.*).

The employee handbook, which Oxbo relies on to show that Defendants knew certain information was confidential, states as follows:

6

> Employees may have access to confidential information, including but not necessarily limited to sensitive operations, client, and vendor business information. Confidential information includes, but is not limited to: computer processes, customer lists, customer preferences, financial information, labor relations strategies, marketing strategies, new materials or product research, pending projects and proposals, proprietary production processes, and/or research and development strategies. All confidential information, including customer and employee information, is the sole property of the Company and may only be used by the Company.
>
> Both during employment and after, employees are required to maintain the confidentiality of such information. All employees will be required to sign a nondisclosure agreement as a condition of employment. Employees who improperly use or disclose trade secrets or confidential business information will be subject to disciplinary action, up to and including termination of employment and legal action, even if they do not actually benefit from the disclosed information.

(ECF No. 45-1, p. 10; ECF No. 45-3, p. 15).

Further, Huckaby's declaration explains that Oxbo purchased Westside in December 2023, with the individual Defendants retaining employment at Oxbo following the sale. (ECF No. 45-3, p. 3). Huckaby explains that, after the purchase of Westside, he learned that from "a high valued customer that their orders were being fulfilled by a company named Trident Agricultural Services ("Trident") for a total of $122,026.44, despite their belief that Oxbo continued to fulfill their specialized orders." (*Id.*). After Oxbo talked to other customers about any dealings with Trident, an investigation revealed that Trident had done business with at least two other customers. (*Id.* at 4). Huckaby asserts that, "[o]nly through Defendants' positions at Oxbo and knowledge of Oxbo's proprietary information and trade secrets, could Trident have known about each of these customers' needs, and fulfilled them in such a manner." (*Id.*).

Additionally, Oxbo offers the declaration of David Park, the computer forensics investigator who examined Defendant Rodrick's computer, which states that the "evidence indicates that Mr. Rodrick used an authenticated login to access the Oxbo SharePoint platform between November 6, 2024, through November 8, 2024, to potentially obtain and use internal files belonging to Oxbo with directory names relating to sales, quotes, contracts, and production of the company." (ECF No. 45-2, p. 6). "Specifically, these folders identified in the directory as 'Fruit Division Sales – Quotes & Contracts – All Documents'; 'Fruit Division

Sales – 2025 – All Documents'; 'Fruit Division Sales – Tomato Quotes – All Documents'; and 'Madera Production – Home.'" (*Id.*). Further, the investigation revealed that Rodrick may have "obtain[ed] and use[d] internal files belonging to Oxbo with directory names relating to management team documents, strategy updates, and account receivables of the company." (*Id.*). Lastly, Parks investigation revealed that four external harddrives were connected to Rodrick's laptop, and one such device contained "files labeled as '2024 Tridrnt Budget.xlsx,' 'Total Boswell Kit.xlsx,' '2023 Total sales CS, Bos, D&D, DelMar, TN.xlsx,' 'Movement.xlsx,' and 'Supplier list.xlsx.'" (*Id.* at 7).

Lastly, Oxbo offers the declaration of Bart Kuijpers, Oxbo's group IT director, which discusses the efforts Oxbo uses to keep information confidential, including using secure network servers, minimum-complexity requirements for passwords, and up-to-date hardware firewalls. (ECF No. 45-4, p. 3). Additionally, Kuijpers investigated Roderick's email, revealing as follows:

> Rodrick received Trident Ag invoices from Hansen relating to a customer who regularly does with business with Oxbo;
> 
> Rodrick handled both his individual entity's (associated with Trident Ag) banking documents and Trident Ag marketing matters;
> 
> Rodrick utilized his Oxbo email address to assist in establishing Trident Ag as a supplier with another, separate customer.
> 
> Rodrick emailed another high-valued customer's equipment sale invoice and agreement to his email address associated with his shareholder entity with Trident Ag.

(*Id.* at 4). Further, Kuijpers "discovered [that] Hansen forwarded SharePoint access to his personal email during his employment with Oxbo," and "Tamez sent a total of eight emails containing additional customer invoices and documents of customer information to his personal email address in the months leading to his departure from Oxbo." (*Id.* at 5).

Notably, Defendants do not present any evidence to dispute these declarations. Nor do they dispute any of these facts in their opposition brief.

Instead, Defendants argue that the trade secrets at issue are not sufficiently defined and that there is insufficient evidence that Oxbo owns them:

> Oxbo's trade secret claims depend on vague categories of data, including "customer lists," "budgets," and "part designs." No particular information is identified and much of it derives from Westside, which Oxbo purchased in December 2023. Oxbo admits as much in its moving papers, stating that it is "Westside's trade secrets, that Oxbo now owns by way of the SPA" that are at issue. The reality here is that the information alleged by Oxbo appears to be leftover information gathered from Westside which the Trident Group had access to before the sale of Westside to Oxbo. So, first and foremost, Oxbo fails to demonstrate that they actually own these trade secrets or otherwise purchased them from Westside. Indeed, the only basis for Oxbo being the "owner" of these alleged trade secrets is the defective SPA, which—as detailed extensively above—is void or voidable.

(ECF No. 48, p. 9).

Upon consideration of the parties' arguments, the Court concludes that Oxbo has a fair chance of success on the merits of its misappropriation claim.

Oxbo has sufficiently identified trade secrets that were owned by Oxbo at the time that Defendants obtained them. Notably, through the declarations detailed above, Oxbo has shown that, while working for Oxbo, Defendants accessed and transferred information that is recognized as trade secrets, including customer lists and financial information, and that those trade secrets were kept confidential by Oxbo. *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) ("We agree that the Customer Database qualifies as a trade secret. The Customer Database has potential economic value because it allows a competitor like Peak to direct its sales efforts to those potential customers that are already using the MAI computer system."); *Logistics Guys Inc. v. Cuevas*, No. 2:23-cv-01592-DAD (CSKx), 2024 WL 3011216, at *7 (E.D. Cal. June 13, 2024) ("[C]onfidential customer-related information including customer lists and contact information, pricing guidelines, historical purchasing information, and customers' business needs/preferences are routinely given trade secret protection.") (citation and quotation marks omitted).

Specifically, David Park's declaration describes information kept on the encrypted solid-state drives from the desktop and laptop computers previously used by Defendant Rodrick during this employment at Oxbo. Park also describes evidence indicating that, while employed at Oxbo, Rodrick used an authenticated login to access a domain name belonging to Oxbo's SharePoint cloud-based platform, which contained "internal files belonging to Oxbo with

9

directory names relating to sales, quotes, contracts, and production of the company. Specifically, these folders are identified in the directory as 'Fruit Division Sales—Quotes and Contracts—All Documents'; 'Fruit Division Sales—2025—All Documents'; 'Fruit Division Sales—Tomato Quotes—All Documents'; and 'Madera Production—Home.'" (ECF No. 45-2, at p. 6). Moreover, the declarations of Huckaby, Park, and Kuijpers explain how Rodrick allegedly obtained and used Oxbo's internal files, and Oxbo was damaged as a result, *e.g.*, "a high valued customer" had their orders fulfilled by Trident "for a total of $122,026.44 despite their belief that Oxbo continued to fulfill their specialized orders." (ECF No. 45-3, p. 4; *see* ECF No. 45-2, pp. 6-7; ECF No. 45-4, p. 4).

Defendants do not dispute any of this evidence. Instead, Defendants dispute the validity of some terms of the Stock Purchase Agreement, such as the non-solicitation provision, on the basis that Defendants were only provided with the signature pages of the agreement and told that it was needed to "release our shares" in Westside. (ECF No. 48-1, at p. 3). In so doing, however, Defendants concede that they transferred their shares of Westside by Oxbo and Oxbo did in fact acquire Westside. (ECF No. 48, p. 3 – explaining release of shares as part of Oxbo's acquisition of Westside; ECF No. 48-1, p. 2 (Hansen declaration) – "I was a shareholder and manager of Westside Equipment Co. ("Westside") until it was acquired by Oxbo Fruit US, Inc. ("Oxbo") in late 2023," and ECF No. 48-1, p. 3 (Hansen declaration) – "I believed I was only confirming the transfer of my shares and nothing more."). Thus, even if the trade secrets at issue previously belonged to Westside, Oxbo would have owned them at the time that Defendants misappropriated them.

Thus, the evidence submitted to the Court shows that Defendants acquired, disclosed, and used Oxbo's trade secrets through improper means, and their actions damaged Oxbo.

Accordingly, the Court concludes that Oxbo has shown a fair chance of success on the merits of its misappropriation claim, which weighs in favor of a preliminary injunction.

**B. Likelihood of Irreparable Injury**

Oxbo argues that it will suffer irreparable injury if a preliminary injunction is not issued:

> Additionally, the damage Oxbo will suffer to its goodwill and business reputation, including loss of client trust in the expectation of confidentiality, is incalculable. This loss of confidentiality of client information is of singular importance to Oxbo. Of course, the potential financial loss cannot be overlooked. Prior to Defendants' resignation and termination, they were responsible for servicing dozens of accounts representing a considerable amount of agricultural machinery sales and maintenance. Absent immediate injunctive relief, many of these clients will continue to be wrongfully diverted by Defendants and their new company. In fact, Oxbo is already aware of three accounts that have been utilizing Trident's services, in some instances, unknowingly. Absent immediate injunctive relief, it is impossible to determine the exact number of Oxbo clients who may be pirated away by Defendants and those acting in concert with them.

(ECF No. 45-1, p. 23).

In opposition, Defendants argue that "Oxbo's goodwill claims are hypothetical" and "[t]he defendants are a small local enterprise in a large agricultural market," while, "[o]n the other hand, Oxbo remains a national corporation with vast resources; any reputational loss is speculative and remediable through damages." (*Id.*).

The Court finds that Oxbo has submitted sufficient evidence of irreparable harm. As discussed above, the Huckaby declaration states that one high-valued customer revealed that Trident had fulfilled orders for a total of $122,026.44 "despite their belief that Oxbo continued to fulfill their specialized orders." (ECF No. 45-3, p. 3). Further, an "investigation revealed that Trident has done business with, at minimum, two other customers for agricultural machinery parts" and "[o]nly through Defendants' positions at Oxbo and knowledge of Oxbo's proprietary information and trade secrets, could Trident have known about each of these customers' needs, and fulfilled them in such a manner." (*Id.* at 4).

As the Ninth Circuit has concluded, "[e]vidence of threatened loss of prospective customers or goodwill certainly supports a finding of the possibility of irreparable harm." *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001). And here, the evidence indicating that Defendants have used Oxbo's own confidential information to lure away its business supports a finding of irreparable harm if a preliminary injunction were not issued. *See Bambu Franchising, LLC v. Nguyen*, 537 F. Supp. 3d 1066, 1078 (N.D. Cal. 2021) ("The Vu's operation of LyChè at the location the Hostetter Shoppe used to occupy and sales of

the same type of drinks to the same customers is circumstantial evidence of threatened loss of prospective customers and goodwill. At least one customer has posted a Google review expressing the opinion that other than the name and logo, everything on the LyChè menu is the same as the Hostetter Shoppe menu. When a customer who previously went to the Bambu Franchise Shoppe now simply goes to LyChè, viewing the stores as the same, Bambu's sales and its market share are reduced.") (footnote omitted).

Accordingly, the Court concludes that Oxbo's likelihood of irreparable injury weighs in favor of a preliminary injunction.

### C. Balance of the Equities

As for the balance of the equities, Oxbo argues as follows:

> Here, the status quo was Oxbo in exclusive possession of its trade secrets, with its client and vendor relationships intact, Oxbo carrying on a profitable enterprise, and Defendants not competing with it. Equity requires Oxbo's business to be protracted from Defendants' complete abdication of their obligations and attempts to compete unfairly against Oxbo using Oxbo's own information. Accordingly, the balance of equities tips in favor of injunctive relief.

(ECF No. 45-1, p. 23).

Defendants counter as follows:

> As to balancing the burden on the defendant if the injunction is granted against the harm suffered by the plaintiff if the injunction is not granted, an injunction would effectively shutter the Trident Group's business, eliminating their ability to work and support their families. On the other hand, Oxbo remains a national corporation with vast resources; any reputational loss is speculative and remediable through damages. Equity disfavors an injunction that imposes economic ruin on individuals to preserve a corporate advantage.

(ECF No. 48, pp. 12-13).

Here, the Court concludes that a balance of the hardships weighs in Oxbo's favor. Notably, as explained above, even Defendants concede that Oxbo acquired Westside, including Defendants' shares in the company, through the Stock Purchase Agreement.  Moreover, Oxbo has provided unrebutted evidence that Defendants misappropriated Oxbo's trade secrets and used them in their business.

Allowing Defendants to use misappropriated confidential trade secret information in

12

Defendants' business would be inequitable. Oxbo does not seek to prevent Defendants from carrying out their business, but rather, for them to refrain from using Oxbo's confidential trade secret information. Accordingly, the Court concludes that the balance of the equities weighs in favor of a preliminary injunction.

### D. The Public Interest

As for the public interest, Oxbo argues that "[n]o critical public interest would be injured by the grant of preliminary relief. To the contrary, the public would benefit from such relief." (ECF No. 45-1, p. 24). Defendant argues as follows:

> [T]he public interest favors employee mobility and fair competition. Oxbo seeks to virtually stifle and suppress the business of the Trident Group under the guise of enforcing a SPA. In the absence of a protected trade secret—which, as laid out above, Oxbo has failed to describe with specificity—the right to compete fairly outweighs the employer's right to protect clients against competition from former employees.

(ECF No. 48, p. 13) (citation and quotation marks omitted).

As noted above, the Court has found that protected trade secrets are at issue and the undisputed evidence submitted to the Court indicates that Defendants have wrongfully used such information in their business. *See Bambu Franchising, LLC*, 537 F. Supp. 3d at 1080 ("The public interest is served by protecting trade secrets. Though California has a strong public policy in favor of vigorous competition, that interest yields to California's interest in protecting a company's trade secrets.") (internal citation and quotation marks omitted).

Accordingly, the Court concludes that the public interest weighs in favor of a preliminary injunction.

### E. Delay

As a general defense to the grant of a preliminary injunction, Defendants argue as follows:

> Here, Oxbo fails to state when it discovered the alleged misappropriation of trade secrets and Oxbo's own filings and declarations confirm that it allegedly discovered the Trident Group's alleged conduct in early 2024, when it claims to have learned of the business formation of the Trident Group in February 2024 and sales to overlapping customers between February to March 2024. Yet, inexplicably, Oxbo has waited until September 2025, nearly nineteen months

> later, to move for a preliminary injunction. California and federal courts repeatedly hold that far shorter delays defeat claims of irreparable harm or equitable relief.

(ECF No. 48, p. 14) (citation omitted).

Oxbo responds as follows:

> Generally, the limitations periods for laches begins when the plaintiff "knew or should have known about the potential cause of action." *Internet Specialties West, Inc v. Milon-DiGiorgio Enterprises, Inc.*, 559 F.3d 985, 990 (9th Cir. 2009).
>
> Defendants' conspiracy to begin their new business venture was not discovered until this year, while one of the defendants, Kris Rodrick, was still employed at Oxbo. Oxbo then swiftly terminated Rodrick's employment, produced a cease and desist, retained counsel and forensic experts, and initiated their investigation to gain concrete evidence of Defendants' activities. What's more, Oxbo attempted to negotiate injunctive relief informally prior to bringing this motion. Accordingly, any delay has been reasonable and has occurred only as a result of Oxbo's measures of performing a thorough investigation and attempting to seek relief without Court intervention.

(ECF No. 52, p. 9).

The Court agrees with Oxbo and finds no unreasonable delay. The evidence presented indicates that Defendant Rodrick performed searches of confidential trade secret information between April 4, 2024 and February 10, 2025. (ECF No. 45-2, at p. 6). Moreover, Defendant Rodrick improperly accessed Oxbo's SharePoint cloud-based platform between October 7, 2024 and March 31, 2025. (ECF No. 45-2, at p. 6). Oxbo promptly filed this lawsuit on March 27, 2025. (ECF No. 1). It filed its motion for preliminary injunction on October 17, 2025. (ECF No. 48).

### F. Bond

Rule 65(c) provides as follows: "The court may issue a preliminary injunction . . .if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Citing this provision, Defendants argue as follows:

> [I]f the Court is inclined to grant any portion of the requested relief, it should condition that relief on Oxbo's posting of a substantial bond under Rule 65(c) sufficient to cover the Trident Group's foreseeable losses from a wrongful injunction (including lost revenues and goodwill, contractual liabilities, staffing

14

impacts, and litigation costs) in an amount no less than $1 million dollars.

(ECF No. 48, p. 16).

Oxbo responds as follows:

> Oxbo does not seek to prevent Defendants from lawfully engaging in business. Rather, Oxbo only seeks to prevent Defendants from engaging in business that directly result from the benefit of its misappropriated trade secrets and confidential information. All business lawfully developed and engaged, remains at Defendants' disposal to produce business income. As a result, no bond is necessary.

(ECF No. 52, p. 9).

The Court will not require a bond. Notably, the Ninth Circuit has noted that, "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (citation and quotation marks omitted, emphasis in original).

As the Court has noted, the injunction it will issue will only require Defendants to refrain from using any misappropriated information. The Court will not issue a broader injunction preventing Defendants from operating their business operations or utilizing their general knowledge of the agricultural field that does not rely on misappropriated information. Accordingly, the Court concludes that there is not a realistic likelihood of harm to Defendants, other than no longer profiting from misappropriated trade secret information.

V. **CONCLUSION AND ORDER**

The Court finds that Oxbo has demonstrated a fair chance of success on the merits of its claim that Defendants Trident Ag Services LLC,[3] Nick Hansen, Kristopher Rodrick, and Estevan Tamez violated California Civil Code § 3426.1 by misappropriating and using Oxbo's confidential and proprietary trade secret information, including the information described in the declaration of Bart Kuijpers (ECF No. 45-4) (listing "company data concerning inventory,

---

[3] The Court notes that, while Oxbo's evidence focuses on the individual Defendants' actions, as opposed to Trident Ag Services, LLC, the individual Defendants formed this entity and have allegedly used misappropriated information to benefit it. Rule 65(d)(2)(C) permits a Court to enjoin those "who are in active concert or participation" with the parties. Because, the evidence indicates that Defendant Trident Ag Services, LLC is in active concert or participation with the individual Defendants, the Court will apply the injunction's terms to Trident Ag Services, LLC as well.

vendors, price lists, sales, customer lists, wholesale prices, and other customer information [that] is stored on an application named Syspro. . . . [and] other forms of internal administrative and intellectual property data are stored within applications such as Microsoft SharePoint and SolidWords. . . .customer quotes for orders, supplier documentations, and other confidential data . . . additional customer invoices and documents of customer information. . . ."); and the declaration of David Park (ECF No. 45-2) (listing "internal files belonging to Oxbo with directory names relating to sales, quotes, contracts, and production of the company. Specifically, these folders identified in the directory as "Fruit Division Sales—Quotes & Contracts—All Documents"; "Fruit Division Sales—2025—All Documents"; "Fruit Division Sales—Tomoato Quotes—All Documents"; and "Madera Production—Home" . . . "internal files belonging to Oxbo with directory names relating to management team documents, strategy updates, and account receivables of the company," "2023 Total sales CS, Bos, D&D, DelMar, TN.xlsx," "Movement.xlsx," and "Supplier List.xlsx.").

The Court also finds that Defendants' use of this misappropriated trade secret information in their business would create irreparable harm to Plaintiff Oxbo.

Accordingly, IT IS ORDERED as follows:

1. The motion for preliminary injunction (ECF No. 45) filed by Plaintiff Oxbo Fruit US Inc. is granted as follows:
    a. The Court hereby enjoins Defendants Trident Ag Services LLC, Nick Hansen, Kristopher Rodrick, Estevan Tamez from continuing the misappropriation or use of Oxbo's trade secrets in any manner including by downloading, copying, distributing, sharing, disclosing, using or applying in any way any of the confidential and proprietary information obtained from Oxbo, including the information described in the declarations of Bart Kuijpers (ECF No. 45-4) and David Park (ECF No. 45-2); and
    b. Defendants Nick Hansen, Kristopher Rodrick, and Estevan Tamez shall each file a declaration with the Court by no later than December 5, 2025, that

    declares, under penalty of perjury, that they have received and will abide by this order.

2. This order shall remain in effect until further order of the Court.

IT IS SO ORDERED.

Dated: __**November 24, 2025**__     /s/ *Erica P. Grosjean*
                 UNITED STATES MAGISTRATE JUDGE